**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| RHONDA WALKER,<br><br>Plaintiff,<br><br>v.<br><br>CITY OF CHICAGO, a municipal corporation, FIRE COMMISSIONER Annette Nance-Holt, in her individual capacity, DEPUTY FIRE COMMISSIONER Brian Helmold, in his individual capacity,<br><br>Defendants. | Case No. 1:24-cv-06514<br><br>Judge Mary M. Rowland |

## MEMORANDUM OPINION AND ORDER

Plaintiff Rhonda Walker ("Walker") brings this action against Defendants City of Chicago (the "City"), Fire Commissioner Annette Nance-Holt ("Commissioner Nance-Holt"), and Deputy Fire Commissioner Brian Helmold ("Deputy Commissioner Helmold") (collectively, "Defendants") alleging sex and race discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) *et seq*. ("Title VII"); retaliation under Title VII; violation of equal protection under 42 U.S.C. § 1983 ("Section 1983"); and violation of the Civil Rights Act of 1866 under 42 U.S.C. § 1981 ("Section 1981"). Defendants have moved for summary judgement [44] on all claims.

For the reasons stated, Defendants' motion for summary judgment [44] is granted.

## SUMMARY JUDGMENT STANDARD

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine dispute as to any material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The substantive law controls which facts are material. *Id.* After a "properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" *Id.* at 250 (quoting Fed. R. Civ. P. 56(e)).

The Court "consider[s] all of the evidence in the record in the light most favorable to the non-moving party, and [ ] draw[s] all reasonable inferences from that evidence in favor of the party opposing summary judgment." *Logan v. City of Chicago*, 4 F.4th 529, 536 (7th Cir. 2021) (quotation omitted). The Court "must refrain from making credibility determinations or weighing evidence." *Viamedia, Inc. v. Comcast Corp.*, 951 F.3d 429, 467 (7th Cir. 2020) (citing *Anderson*, 477 U.S. at 255). In ruling on summary judgment, the Court gives the non-moving party "the benefit of reasonable inferences from the evidence, but not speculative inferences in [its] favor." *White v. City of Chicago*, 829 F.3d 837, 841 (7th Cir. 2016) (internal citations omitted). "The controlling question is whether a reasonable trier of fact could find in favor of the non-moving party on the evidence submitted in support of and opposition to the motion for summary judgment." *Id.*

## LOCAL RULE 56.1

"Local Rule 56.1 statements serve to streamline the resolution of summary judgment motions by having the parties identify undisputed material facts and cite

the supporting evidence." *Laborers' Pension Fund v. Innovation Landscape, Inc.*, No. 15 CV 9580, 2019 WL 6699190, at *1 (N.D. Ill. Dec. 9, 2019). The Seventh Circuit has "consistently upheld district judges' discretion to require strict compliance with Local Rule 56.1." *Kreg Therapeutics, Inc. v. VitalGo, Inc.*, 919 F.3d 405, 414 (7th Cir. 2019) (quotation omitted); *see also Zuppardi v. Wal-Mart Stores, Inc.*, 770 F.3d 644, 648 (7th Cir. 2014) ("We have frequently said that it is within the district court's discretion to strictly enforce local rules regarding summary judgment by accepting the movant's version of facts as undisputed if the non-movant has failed to respond in the form required.").

Both parties have failed to comply with Local Rule 56.1. As to Walker, her Local Rule 56.1 statement and response to Defendants' Local Rule 56.1 statement repeatedly include purported facts that misrepresent the record, *e.g.*, [54] ¶¶ 26, 29, 30, 35, and improper legal argument. *See e.g.*, [53] ¶¶ 40–43, 48–49, 51–53. As to Defendants, the facts in their Local Rule 56.1 statement are unduly drawn-out, often containing numerous sub-facts sometimes running nearly a page in length. *See e.g.*, [45] ¶¶ 40, 44, 49, 60, 71, 77. Their responses to the purported facts in Walker's Local Rule 56.1 statements are similarly long-winded, *e.g.*, [59] ¶¶ 23, 29, 30, 36, 37, and frequently contain improper—and contradictory[1]—legal arguments. *See e.g.*, *id.* ¶¶ 24, 31, 34, 35, 37.

[1]As just one example, Defendants object to Walker's statement of fact that "Keller testified he heard that Deputy Commissioner Ferman said Walker did a good interview" as inadmissible hearsay. [59] ¶ 31. In addition to Ferman's testimony qualifying as a party-opponent admission, Defendants cite to that very same testimony in their own Local Rule 56.1 statement. [45] ¶ 44.

Overall, the parties' Local Rule 56.1 statements and responses frustrate the rule's purpose of streamlining resolution of summary judgment motions. As it recounts the facts below, the Court does not attempt to address all the parties' disputes. Instead, unless otherwise noted, the facts described below are accepted as true.

## BACKGROUND

### I. Walker's Background

Walker, a black female, worked for the Chicago Fire Department ("CFD") from October 1, 1991 until her retirement on August 16, 2024. [45] ¶¶ 10, 11. Over her tenure, Walker held many roles within CFD, including Firefighter EMT, Lieutenant, Captain, and Battalion Chief. *Id.* ¶ 11. Of relevance here, from 2021 until her retirement, Walker was a Battalion Chief for CFD Battalion 21, located in Chicago's Beverly neighborhood. *Id.* ¶¶ 11, 12.

While serving as Battalion Chief for CFD Battalion 21, Walker had four firehouses and associated personnel under her command. *Id.* ¶ 12. Walker worked as the first shift Battalion Chief for Battalion 21, meaning she worked one 24-hour period and then had 48 hours off while the second and third shift Battalion Chiefs worked their 24-hour shifts. *Id.* During Walker's tenure as Battalion Chief for CFD Battalion 21, the second shift Battalion Chief was Pete Cunningham, and the third shift Battalion Chief was Mike Sullivan. *Id.* ¶ 12.

### II. The Deputy District Chief Promotions

In CFD's hierarchy, the next rank up from Battalion Chief is Deputy District Chief. *Id.* ¶ 18. Deputy District Chiefs are senior positions within CFD and generally

handle major incidents, the safety of responding CFD personnel, and critical mayday calls. *Id.* ¶¶ 19, 23. Deputy District Chiefs are split into five separate districts, with three 24-hour Deputy District Chief shifts per district. *Id.* ¶ 19. In addition, there are some "citywide" Deputy District Chief positions. *Id.* There is no specific level of education or training required to be promoted to Deputy District Chief. *Id.* ¶ 20. Instead, a candidate must only hold the rank of Battalion Chief. *Id.* Nevertheless, a candidate's experience with various types of incidents and the training received by the candidate are factors in the promotion process. [45-16] at 36:13–39:2.

In 2022, due to a shortage of Deputy District Chiefs, CFD determined that additional promotions from Battalion Chief to Deputy District Chief were necessary. [45] ¶ 26. As such, on September 7, 2022, Commissioner Nance-Holt, through her Chief of Staff, sent an email to all Battalion Chiefs seeking applications from those interested in becoming Deputy District Chief. *Id.* ¶¶ 26, 28. The following Battalion Chiefs submitted applications in response to the email: Gary Brooks ("Brooks"), Kelly Burns ("Burns"), Shun Haynes ("Haynes"), Gerald Hughes ("Hughes"), Chris Nechvatal ("Nechvatal"), Raul Ochoa ("Ochoa"), Christopher Serb ("Chris Serb"), Scott Shawaluk ("Shawaluk"), and Walker. *Id.* ¶ 29. Brooks and Haynes are black males. *Id.* Burns, Hughes, Nechvatal, Chris Serb, and Shawaluk are white males. *Id.* Ochoa is a Hispanic male. *Id.*

The Battalion Chiefs who submitted applications were later interviewed by a four member-panel consisting of Deputy Commissioner of Operations Marc Ferman ("Deputy Commissioner Ferman"), Deputy Commissioner of Logistics Brandon Keller

("Deputy Commissioner Keller"), Assistant Deputy Fire Commissioner of Suppression and Rescue Donald Walker ("Assistant Deputy Commissioner Walker"), and Deputy District Chief Walter Schroeder. *Id.* ¶ 30. The panel was put together by Deputy Commissioner Ferman, whom Commissioner Nance-Holt had assigned to conduct the Deputy District Chief interviews. *Id.* ¶¶ 27, 30, 31. The parties dispute the extent of Commissioner Nance-Holt and Deputy Commissioner Helmold's involvement in the promotion process for Deputy District Chiefs. [53] ¶ 51; [59] ¶ 35. It is undisputed, however, that Commissioner Nance-Holt did not personally suggest any candidates for promotion or review any resumes. [45] ¶¶ 26, 30.

The panel conducted its interviews using standardized questions. *Id.* ¶ 32. Due to differing scheduling demands, however, the entire panel was not present for every interview. *Id.* ¶ 30. Walker's interview, for instance, was conducted by Deputy Commissioner Ferman and Assistant Deputy Commissioner Walker. *Id.* ¶ 14. Following the interviews, the panel discussed the candidates and ranked them. *Id.* ¶ 32. Aside from the interviews, Deputy Commissioner Ferman relied on resumes and his attention to radio communications and day-to-day operations when assessing the candidates. [54] ¶ 25. Deputy Commissioner Ferman ultimately ranked Walker eighth or ninth out of the pool of candidates. [45] ¶ 33. Assistant Deputy Commissioner Walker similarly did not rank her highly compared to the other candidates. *Id.*

The panel eventually selected Haynes and Burns for promotion to Deputy District Chief. *Id.* ¶ 34. Deputy Commissioner Ferman thereafter took Haynes and Burns'

names to Commissioner Nance-Holt and, after vetting and background checks, Haynes and Burns were promoted to Deputy District Chief on or about November 16, 2022. *Id.*; [53] ¶ 34; [45-11] ¶ 7.

Following the November 2022 promotions, a second round of Deputy District Chief promotions occurred in 2023. [45] ¶ 35. The panel did not conduct another round of interviews for the second round and instead relied on the same materials and interviews from November 2022 promotions. *Id.* The panel eventually selected Brooks, Ochoa, Chris Serb, and Douglas Schick[2] for promotion to Deputy District Chief. *Id.* The second round of promotions were effective on or about March 16, 2023. *Id.*

A third round of Deputy District Chief promotions occurred in 2024. *Id.* ¶ 37. Applicants who had previously interviewed and were still interested in the role were considered. [53] ¶ 37. Additionally, several new Battalion Chiefs who had expressed interest in the role were interviewed and considered. [45] ¶ 37. These included Douglas Crowley ("Crowley"), Ernie Pinkston ("Pinkston"), Roger Huff ("Huff"), Charles Kinnerk ("Kinnerk"), Mark Mielnicki ("Mielnicki"), Michael Beam ("Beam"), and Steven Serb ("Steve Serb"). *Id.* ¶ 38. Crowley, Kinnerk, Mielnicki, Beam, and Steve Serb are white males. *Id.* Pinkston and Huff are black males. *Id.*

The new candidates were interviewed by a different panel consisting of Deputy Commissioner Ferman, Assistant Deputy Commissioner Walker, and Assistant Deputy Commissioner of Airport Operations John Geis. *Id.* ¶ 37. Much like the earlier

[2]It is unclear from the record whether Douglas Schick submitted his application in response to the September 7, 2022 email or later. Douglas Schick is a white male. [45] ¶ 35.

promotions for Deputy District Chief, following the interviews, the panel discussed the candidates and made their recommendations. *Id.*

Regarding Crowley, Deputy Commissioner Ferman testified[3] that his interview was "very strong" and that he was the best candidate. *Id.* ¶ 40. Deputy Commissioner Ferman further testified that Crowley's communications over the radio during the time that he operated as an Incident Commander were "just solid" and that he was a better communicator over the radio than Walker. *Id.* Deputy Commissioner Ferman had no safety concerns about Crowley. *Id.*

Regarding Mielnicki, Deputy Commissioner Ferman testified that he was able to address issues "concerning dealing with dangerous buildings" and had "exhibited good communication over the radio on a daily basis." *Id.* ¶ 41. Deputy Commissioner Ferman also noted that Mielnicki had special operations training, which was a "huge advantage." *Id.* Deputy Commissioner Ferman had no safety concerns about Mielnicki. *Id.*

Regarding Pinkston, Deputy Commissioner Ferman testified that he also had good radio communication skills and that he was able to paint "a good picture of what's in front of him and what's happening." *Id.* ¶ 42. Deputy Commissioner Ferman considered Pinkston to be a better communicator on the radio than Walker and had no safety concerns with him. *Id.*

---

[3]While Walker repeatedly disputes the implications of Deputy Commissioner Ferman's testimony, [53] ¶¶ 40–44, she does not dispute that Deputy Commissioner Ferman testified as such regarding Crowley, Mielnicki, Pinkston, and Shawaluk.

Regarding Shawaluk, Deputy Commissioner Ferman testified that he had good communication skills and interviewed well. *Id.* ¶ 43. Deputy Commissioner Ferman also testified that he had previously worked on an incident with Shawaluk and was impressed with Shawaluk's communication abilities during the incident. *Id.* Deputy Commissioner Ferman likewise had no safety concerns with Shawaluk. *Id.*

Regarding Walker, Deputy Commissioner Ferman acknowledged that she had more seniority and experience as a Battalion Chief than the other candidates and was qualified for the promotion[4]. [54] ¶ 24. Deputy Commissioner Ferman further acknowledged that Walker had additional training and experience—including in airport operations, high-rise incident command, with the Fire Prevention Bureau, and as a Captain in a busy downtown area—that was considered an attribute to her candidacy. [45] ¶ 46; [54] ¶ 24. Deputy Commissioner Ferman also mentioned to Deputy Commissioner Keller that Walker did well in her interview,[5] [45] ¶ 44; [54] ¶ 31, and Deputy Commissioner Keller testified that he thought Walker could act in the capacity of a Deputy District Chief.[6] [59] ¶ 29.

[4]Though Defendants object to the implication from these assertions—*i.e.*, that Walker was the best candidate for the promotion—they do not disagree that Walker was qualified for the promotion due to her role as Battalion Chief and that she had more seniority as a Battalion Chief than the other candidates. [59] ¶ 24.

[5]Defendants object to this fact, arguing that this testimony is inadmissible hearsay. [59] ¶ 31. But as an agent of the City, Deputy Commissioner Ferman's statements are admissible for their truth. Fed R. Evid. 801(d)(D). Additionally, Defendants cite this very same fact in their own Local Rule 56.1 statement. [45] ¶ 44.

[6]Deputy Commissioner Keller was asked whether he thought Walker could act up in the capacity of Deputy District Chief, meaning act in temporary capacity; he was not asked his opinion about her being permanently promoted. [59] ¶ 29; [45-19] at 19:13–21:7.

Despite these assessments of Walker, the panel ultimately did not select her during the third round of promotions and instead selected Crowley, Mielnicki, Pinkston, and Shawaluk. [45] ¶ 39. Deputy Commissioner Ferman explained that it wasn't that Walker was ever disqualified for the promotion to Deputy District Chief, but rather that he was trying to pick the best possible person who was available at that time. *Id.* ¶ 45. Specifically, Deputy Commissioner Ferman was looking to choose Deputy District Chiefs who he thought had the best training, could best handle emergency incidents, and had the best communication skills, the latter of which are very important. *Id.* ¶¶ 21, 22, 45. Although Walker did a good job communicating over radio and he had no issues with her radio communications,[7] Deputy Commissioner Ferman testified that there were nevertheless incidents where he had to send the deputy to monitor what was going on with Walker. [45] ¶ 44; [54] ¶ 26. Assistant Deputy Commissioner Walker similarly noted[8] that Walker was not as efficient at communicating over the radio as the other candidates. [45-18] ¶ 9. And Deputy Commissioner Keller testified[9] that while he did not have issues with Walker's radio

[7]Deputy Commissioner Ferman testified that he did not have issues with Walker's radio communication, and she did a good job communicating on the radio. [53] ¶ 44. Walker ignores that he qualified his assessment of Walker's radio communication skills by noting incidents where he had to send the deputy or ask him to monitor what was going on. [59] ¶ 26. *See* [45-16] at 79:13–23.

[8]Defendants argue that Assistant Deputy Commissioner Walker found Walker's communication skills to be "wanting." [45] ¶ 44. This is not supported by the record. Assistant Deputy Commissioner Walker stated only that Walker was not as efficient at communicating over the radio as other candidates. [45-18] ¶ 9.

[9]Deputy Commissioner Keller testified that he did not have issues Walker's radio presence, [53] ¶ 44, and he qualified his assessment of Walker's radio presence by noting Walker would be "out of breath" and say "for point of information" before relaying information, which was not necessary. [59] ¶ 30. *See* [45-19] at 30:6–31:2.

presence, she sounded out of breath over the radio and would unnecessarily say the phrase "for point of information" before relaying information. [45] ¶ 44; [54] ¶ 30.

The third round of promotions were effective on or about February 16, 2024. [45] ¶ 39.

### III. Training and "Working Up"

CFD firefighters have various training opportunities available to them to better prepare themselves for their job and promotion. *Id.* ¶ 56. In addition, CFD gives Battalion Chiefs opportunities to shadow acting Deputy District Chiefs to see firsthand what the job entails. *Id.* ¶ 62. This process is referred to as "riding along." *Id.* Walker maintains that the opportunity to "ride along" with Deputy District Chiefs was made available to white male Battalion Chiefs but never to her. [54] ¶ 32.

CFD also gives Battalion Chiefs opportunities to temporarily work as a Deputy District Chief for a 24-hour period. [45] ¶ 68. This temporary assignment is referred to as "working up." *Id.* During the relevant period, Deputy Commissioner Ferman oversaw setting schedules for Battalion Chiefs to "work up." *Id.* ¶ 70. When making these schedules, he would compile lists of Battalion Chiefs eligible to temporarily fill a Deputy District Chief role for a given shift—based on criteria such as who was working that day, their location, where a temporary Deputy District Chief was needed, and who had expressed interest in "working up"—and then contact those Battalion Chiefs to see if they wanted the assignment. *Id.* ¶¶ 70–71. Though Walker testified that she was able to "work up" as a Deputy District Chief on three occasions,

[45-2] at 55:3–8, she asserts was not given the same opportunities to work up as others. [55] at 9.

## IV. Walker's EEOC Charges

On or about September 11, 2023, Walker filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") (the "September 2023 EEOC Charge"). [45] ¶ 1. The September 2023 EEOC Charge alleged a failure to promote on November 16, 2022 and March 16, 2023 based on Walker's race, sex, and retaliation. *Id.*

Eight months later, on May 10, 2024, Walker filed a second charge of discrimination with the EEOC (the "May 2024 EEOC Charge"), again alleging discrimination based on race, sex, and retaliation. [45] ¶ 5; [45-2] at 220. The May 2024 EEOC Charge alleges that Walker was passed over for promotion to Deputy District Chief in November 2021, on March 16, 2023, and February 19, 2024. [45-2] at 220. It also alleges that Walker was not allowed to "work up" or "train" as much as male Battalion Chiefs who were seeking appointments to Deputy District Chief and that Walker had engaged in protected activities on numerous occasions, including: (1) a January 10, 2017 charge filed against the City with the City's Commission on Human Relations alleging sex discrimination, (2) a January 31, 2017 charge filed against the City with the Illinois Department of Human Rights ("IDHR") alleging race and sex discrimination, (3) a December 16, 2019 promotion to Battalion Chief as part of a resolution of a grievance related to the City's discriminatory test scoring, (4) a February 19, 2020 charge filed against the City with IDHR alleging sex

discrimination and retaliation, (5) a May 5, 2021 lawsuit filed in the Circuit Court of Cook County alleging sex discrimination and retaliation, and (6) the September 2023 EEOC Charge. *Id.*

During her deposition, Walker testified that aside from the May 2024 EEOC Charge itself, the list of protected activities in her May 2024 EEOC Charge was complete and that she was unaware of any other time she brought a claim or charge other than those listed in the May 2024 EEOC Charge. [45] ¶ 6.

## V. Walker's Settlement Agreement with the City

On November 19, 2024, Walker entered into a settlement agreement with the City ("Settlement Agreement"). [45] ¶ 2; [45-2] at 209–16. The Settlement Agreement released and discharged "all claims related to [Walker's] employment with the City of Chicago … known to her as of January 18, 2024, that she may have against the [City] and its future, current, or former officers, employees, and agents." [45-2] at 211. All claims "that were not known to Plaintiff as of January 18, 2024" were "expressly not being released or settled" as part of the Settlement Agreement. *Id.* at 210 (emphasis in the original).

During her deposition, Walker acknowledged that the February 16, 2024 Deputy District Chief promotions were the only promotions in her Complaint that she was not aware of as of January 18, 2024. [45] ¶ 7; [53] ¶ 7.

## VI. The Instant Action

On July 26, 2024, Walker filed this instant action, alleging sex and race discrimination under Title VII against the City (Counts I and II); retaliation under

Title VII against the City (Count III); violation of Section 1983 against all Defendants (Count IV); and violation of Section 1981 against all Defendants (Count V). [1] ¶¶ 47–89.

On January 16, 2026, Defendants moved for summary judgment. [44].

## ANALYSIS

### I. Sex and Race Discrimination (Counts I and II)

In a Title VII discrimination case, to survive summary judgment, "a plaintiff must present evidence that would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the adverse employment action." *Barbera v. Pearson Educ., Inc.*, 906 F.3d 621, 628 (7th Cir. 2018) (cleaned up). A plaintiff can meet this burden by introducing direct evidence of discrimination or, alternatively, by utilizing the familiar *McDonnell Douglas* burden-shifting framework. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under *McDonnell Douglas*, if the plaintiff makes out a *prima facie* case of discrimination, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the challenged employment action. *Barbera*, 906 F.3d at 629. If the defendant meets its burden, then the burden shifts back to the plaintiff to offer evidence that the given reason is pretextual, "meaning not merely wrong but false." *Kinney v. St. Mary's Health, Inc.,* 76 F.4th 635, 646 (7th Cir. 2023).

If a plaintiff cannot prevail using the *McDonnell Douglas* method, she can still defeat summary judgment if the evidence "as a whole" "would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other

proscribed factor caused the discharge or other adverse employment action." *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016); *Barbera*, 906 F.3d at 629.

Here, Walker offers no direct evidence of discrimination based on her race or sex. Therefore, to survive summary judgment, Walker must proceed under the *McDonnell Douglas* framework or holistic approach. The Court will first evaluate whether Walker satisfies the *McDonnell Douglas* framework. The Court will then consider the evidence holistically.

#### a. *McDonnell Douglas*

Walker predicates her discrimination claims on two distinct adverse employment actions: (1) that, due to her sex and/or race, she was not allowed to train or "work up" in the position of Deputy District Chief and, (2) that, due to her sex and/or race, she was passed over for promotion to Deputy District Chief. [1] ¶¶ 23–27; [55] at 2–5. As the *McDonnell Douglas* framework differs slightly between each of these adverse employment actions, the Court addresses each in turn.

##### i. Failure to Be Given Opportunities to Train and "Work Up"

To make out a *prima facie* case of discrimination under a failure to train theory, a plaintiff must demonstrate that: (1) she is a member of a protected group; (2) the defendant provided training to its employees; (3) she was eligible for training; and (4) she was not provided training under circumstances giving rise to an inference of discrimination, *i.e.*, she was denied training given to other similarly situated employees who were not members of the protected group. *Malacara v. City of Madison*, 224 F.3d 727, 729 (7th Cir. 2000). The City focuses on the last element,

contending that Walker presents no evidence that she was denied training given to other similarly situated employees who were not members of her protected group. [46] at 19–21. The Court agrees.

Though Walker contends she was denied opportunities to train, "ride along," or "work up" as a Deputy District Chief, her evidence in support is limited to her testimony, [54] ¶ 32, and does not identify any specific instance—let alone any instance she became aware of after January 18, 2024—where she was denied an opportunity to train, "ride along," or "work up" that she was otherwise eligible for. Moreover, Walker presents no evidence of any similarly-situated CFD employee who was given a training opportunity that she was denied. A plaintiff's uncorroborated, conclusory statements that "other" similarly-situated co-workers were treated differently are insufficient to establish a *prima facie* case of discrimination. *Oest v. Illinois Dep't of Corr.*, 240 F.3d 605, 614 (7th Cir.2001). And while Walker asserts that "City Manpower" would have records of the employees who were scheduled to work up, [53] ¶¶ 58, 59, Walker was given ample opportunity gather evidence from "City Manpower" or other sources during the discovery period.

ii. <u>Failure to Promote</u>

To make out a *prima facie* case of discrimination on a failure to promote theory, a plaintiff must produce evidence showing that: "(1) she was a member of a protected class; (2) she was qualified for the position sought; (3) she was rejected for the position; and (4) the employer promoted someone outside of the protected class who was not better qualified for the position" *Riley v. Elkhart Cmty. Schs.*, 829 F.3d 886,

892 (7th Cir. 2016) (citation omitted). The City does not dispute that Walker has satisfied the first three elements. [46] at 13. The City instead focuses on the final element and contends that Walker cannot show that someone outside of her protected class who was less qualified was promoted to Deputy District Chief, and, even if she could, Walker presents no evidence that the City's legitimate, non-discriminatory reason for not promoting Walker was pretextual. *Id.* at 13–16. Because the question of pretext here is intertwined with the fourth element of the *prima facie* case, the Court proceeds directly to that issue. *Scruggs v. Garst Seed Co.*, 587 F.3d 832, 838 (7th Cir. 2009) ("The prima facie case and pretext analyses often overlap, so we have said that we can proceed directly to the pretext inquiry if the defendant offers a nondiscriminatory reason for its action.").

Before proceeding, however, the Court addresses the effect of the Settlement Agreement on Walker's failure to promote theory. Three rounds of Deputy District Chief promotions occurred during the relevant period: one in November 2022, another in March 2023, and another in February 2024. The Settlement Agreement, though, released "all claims related to [Walker's] employment with the City" that were "known to her as of January 18, 2024." [45-2] at 211. At her deposition, Walker acknowledged that the February 2024 promotions were the only promotions in her Complaint that she was unaware of as of January 18, 2024. [45] ¶ 7; [53] ¶ 7. Accordingly, due to her Settlement Agreement, Walker can only proceed on the City's alleged failure to promote her in February 2024.

The City's proffered non-discriminatory reason for not promoting Walker to Deputy District Chief in February 2024 is straightforward: Walker was not a top candidate. When making decisions on Deputy District Chief promotions in February 2024, Deputy Commissioner Ferman testified that the panel was looking to pick the best possible person available at the time, and specifically, those who had the best training, could best handle emergency incidents, and had the best communication skills. [45] ¶ 45. Based on interviews, resumes, and attention to each candidate's radio communications and day-to-day operations, the panel believed that Crowley, Mielnicki, Pinkston, and Shawluck each exhibited valuable attributes and skills, had stronger radio communication abilities compared to Walker, and were ultimately the best candidates. [45] ¶¶ 39–43; [45-18] ¶¶ 9, 10; [54] ¶ 25. Promoting individuals who an employer believes are better qualified for a position is legitimate, nondiscriminatory reason for an action. *See Scruggs*, 587 F.3d at 838.

As the City has articulated a legitimate, nondiscriminatory reason for its promotion decision, Walker must present sufficient evidence to create a genuine issue of material fact as to pretext.

An otherwise legitimate, non-discriminatory hiring rationale is pretextual if the hiring manager did not "sincerely believe[ ]" the rationale when making his final decision. *Little v. Ill. Dep't of Revenue*, 369 F.3d 1007, 1015 (7th Cir. 2004). In other words, "pretext means a lie, specifically a phony reason for [the] action." *Smith v. Chi. Transit Auth.*, 806 F.3d 900, 905 (7th Cir. 2015) (quoting *Wolf v. Buss (Am.) Inc.*, 77 F.3d 914, 919 (7th Cir. 1996)). When an employer honestly believed it promoted the

best candidate, its reasoning is not pretext, "even if its decision was inaccurate, unfair, ... foolish, trivial, or baseless." *Cunningham v. Austin*, 125 F.4th 783, 790 (7th Cir. 2025) (quoting *Barnes-Staples v. Carnahan*, 88 F.4th 712, 716 (7th Cir. 2023)).

Walker offers several reasons why the City's stated reason for not promoting her to Deputy District Chief in February 2024 is pretextual, none of which are sufficient. She first argues that the City's proffered reason is "shifting or inconsistent," pointing to the fact that Deputy Commissioner Ferman had previously praised her for doing a "good job" communicating over the radio and Deputy Commissioner Keller testified that he did not have issues with her radio presence. [55] at 11. But praising Walker for doing a "good job" and having no issues with her radio skills is not inconsistent with the belief that Crowley, Mielnicki, Pinkston, and Shawluck were better than Walker. *Schuster v. Lucent* Techs., Inc., 327 F.3d 569, 577 (7th Cir. 2003) (explanations "must actually be shifting and inconsistent to permit an inference of mendacity."). This is especially so here, as Deputy Commissioner Ferman and Keller's praise of Walker's radio communication abilities were each qualified. [45] ¶ 44. Nor is Deputy Commissioner Ferman's testimony that he one time had to respond to an incident involving Crowley, [55] at 11 (citing [54] ¶ 38[10]), inconsistent with his belief that Crowley was a top candidate, particularly given his explanation that the incident turned out to be "rubbish." [45-16] at 145:1–13.

[10]Defendants explain that the "promotion" referenced in this testimony is not referring to Crowley's promotion to Deputy District Chief, but to Battalion Chief. [59] ¶ 38. The Court agrees but accepts as true that Deputy Commissioner Ferman did respond to an incident involving Crowley.

Walker further points to the fact that Deputy Commissioner Ferman testified that he did not recall specific variations between candidate interviews. [55] at 10 (citing [45-16] at 73:16–74:1). But that testimony likewise does not create an inference of pretext. No reasonable jury could conclude that Deputy Commissioner Ferman's inability to recall pairwise distinctions between candidate interviews meant that he did not honestly believe that Crowley, Mielnicki, Pinkston, and Shawluck were overall the best candidates, particularly where Deputy Commissioner Ferman relied on more than just interviews in his assessment. [54] ¶ 25.

Walker also presents a statistical argument, noting that the promotion process led to only males being selected for promotion to Deputy District Chief. [55] at 11. That is true. But for statistics to support an employment discrimination claim, "the plaintiff must *also* proffer individualized evidence of discrimination." *Cunningham*, 125 F.4th at 791 (emphasis in the original). Walker has not done so here.

Finally, Walker emphasizes that the Deputy District Chief promotion process was based on entirely subjective criteria, including informal interviews, discussions, and personal observations. [55] at 7–11. The City disputes this characterization of the promotion process. [59] ¶¶ 11, 13, 23. But even if it was subjective, "absent evidence that subjective hiring criteria were used as a mask for discrimination, the fact that an employer based a hiring or promotion decision on purely subjective criteria will rarely, if ever, prove pretext under Title VII." *Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1176 (7th Cir. 2002) (cleaned up). Here, Walker presents no evidence that the alleged subjective promotion process masked a discriminatory intent.

At bottom, Walker is unable to cast doubt on the veracity of the City's explanation that she was not a top candidate for February 2024 promotions. Therefore, she fails to raise an inference that the explanation for them is a pretext for discrimination.

**b. Evidence as a Whole**

Walker fares no better on a holistic review of the evidence. In a holistic review, the "[e]vidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself." *Ortiz*, 834 F.3d at 765. But even taken as a whole, the evidence presented does not create an inference that the City discriminated against Walker. As to her failure to train theory, Walker provides no evidence besides her own testimony that she was denied opportunities to train, "ride along," or "work up" due to her sex and/or race. And as to her failure to promote theory, while Walker may have had more seniority, Crowley, Mielnicki, Pinkston, and Shawluck each exhibited other attributes and skills, particularly in radio communications, that led the panel to believe that they were the best options. Walker provides no evidence, direct or circumstantial, to discredit the panel's decision to consider those skills over Walker's seniority and other training. Nor does Walker provide evidence that her credentials were "so superior to the credentials of the person selected for the job that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question." *Millbrook*, 280 F.3d at 1180–81 (citation omitted).

In sum, Walker has not produced sufficient evidence, individually or when viewed as a whole, from which a reasonable jury could find race and/or sex discrimination. For these reasons, the Court grants the City summary judgment on Counts I and II.

## II. Retaliation (Count III)

To survive summary judgment on a Title VII retaliation claim, a plaintiff must produce evidence from which a reasonable jury could find that (1) she engaged in a statutorily protected activity, (2) her employer took a materially adverse action against her, and (3) there was a causal connection between the two. *Alley v. Penguin Random House*, 62 F.4th 358, 361 (7th Cir. 2023). "The key question is whether a reasonable juror could conclude that there was a causal link between the protected activity ... and the adverse action." *Id.* (citation omitted). Relevant evidence may include "suspicious timing, a pretextual explanation for the termination, and evidence that similarly situated employees were treated differently." *Gracia v. SigmaTron Int'l, Inc.*, 842 F.3d 1010, 1021 (7th Cir. 2016). As with discrimination claims, a plaintiff's evidence must be considered "as a whole" to determine if a causal link exists. *Lesiv v. Illinois Cent. R.R. Co.*, 39 F.4th 903, 911 (7th Cir. 2022) (citing *Ortiz*, 834 F.3d at 765).

The City does not dispute the first two elements of Walker' retaliation claim. [46] at 22. It instead focuses on causation, asserting that Walker cannot show any causal link between her protected activities and any adverse employment action. *Id.* Walker contests this, maintaining that the evidence supports an inference of causation. [55] at 12. Unlike her discrimination claims, Walker points only to her failure to be

promoted in February 2024 as the adverse action underlying her retaliation claim. *Id.* at 12–13.

As a threshold matter, the parties are at odds over whether the evidence establishes that those involved in the February 2024 promotions had knowledge of Walker's lawsuits and EEOC complaints prior to the February 2024 promotions. [53] ¶¶ 47, 48; [59] ¶ 39. Knowledge of the plaintiff's protected activities is necessary to show causation for a retaliation claim. *Lesiv*, 39 F.4th at 915–16 ("A supervisor simply cannot retaliate against an employee for engaging in protected activity if the supervisor was not aware of the protected activity in the first place."). As such, Walker can only survive summary judgment by offering evidence that those involved in the February 2024 promotions actually knew of her protected activities. The Court, however, need not resolve this evidentiary debate—even if those involved had requisite knowledge, the timeline does not support an inference of retaliation.

Although there is "no set legal rule," the Seventh Circuit has typically allowed "no more than a few days to elapse between the protected activity and the adverse action." *Sweet v. Town of Bargersville*, 18 F.4th 273, 279 (7th Cir. 2021) (citing *Kidwell v. Eisenhauer*, 679 F.3d 957, 966 (7th Cir. 2012)). Here, the latest in time protected activity that occurred before the February 2024 promotions was Walker's September 2023 EEOC Charge. [45-2] at 220. The 5-month gap between Walker's September 2023 EEOC Charge and the February 2024 promotions, however, is too attenuated to infer any retaliatory intent. *See Bargersville*, 18 F.4th at 279 (finding a three-month gap too long to support an inference of retaliatory motive); *Shreffler v. City of*

*Kankakee, Illinois*, No. 21-3376, 2024 WL 1826976, at *9 (7th Cir. Apr. 26, 2024) (two months insufficient).

Perhaps recognizing this long gap, Walker offers other purported evidence of retaliatory motive, none of which saves her claim. Walker, for instance, argues that "when combined with evidence of pretext," the timing "is sufficiently close to support an inference of causation." [55] at 12. But as already discussed, a reasonably jury could not find that the City's proffered reason for not promoting Walker to be pretextual. *Supra* § I. Walker also points to testimony from Deputy Commissioner Keller that "speculation" existed within CFD that employees with lawsuits were "looked past" in the vetting process. [54] ¶ 39. Speculation, however, is not evidence and is not sufficient to overcome summary judgment. *Bass v. Joliet Pub. Sch. Dist. No. 86*, 746 F.3d 835, 841 (7th Cir. 2014). Walker's final argument for retaliatory motive rests on the fact that none of the candidates promoted in the February 2024 cycle had filed EEO complaints with the City, and Deputy Commissioner Ferman was unaware of any such complaints by those candidates. [55] at 13 (citing [54] ¶ 37[11]). But to make such an inference, Walker needs to show that she is "directly comparable in all material respects" to those candidates. *Hudson v. Chi. Transit Auth.*, 375 F.3d 552, 561 (7th Cir. 2004) (citation omitted). Walker does not do so. At best, her comparator evidence consists solely of the fact that she, Crowley, Mielnicki, Pinkston, and Shawluck all held the role of Battalion Chief during the February 2024 promotion cycle. Walker provides no detail comparing her and the other candidates' training,

---

[11]Defendants challenge this fact as unsupported by citation. [59] ¶ 37. But it is supported by citation, [45-6] ¶ 29; [45-16] at 124:3–13, and the Court accepts it as true.

experiences with different types of incidents, skills, or other attributes that would permit a reasonable jury to conclude that their promotion was the result of a retaliatory motive rather than some other variable. *See Coleman v. Donahoe*, 667 F.3d 835, 847 (7th Cir. 2012) ("There must be enough common factors ... to allow for a meaningful comparison in order to divine whether intentional discrimination was at play.") (cleaned up). As Walker bears the burden of presenting evidence on this issue, her comparator inference fails.

Lastly, Walker cites an admission from the City that its Office of the Inspector General ("OIG"), at some point around April 2021, audited CFD's policies and determined that CFD's process for scheduling interviews of those who had filed discrimination complaints put them at risk of retaliation. [55] at 13 (citing [54] ¶ 40). Walker, however, presents no other evidence on this audit, leaving critical issues remaining. What did the OIG audit entail? Did it cover promotions to Deputy District Chief? Did CFD modify its procedures? Without any evidentiary details on the OIG's audit, the bridge from the City's admission that an OIG audit was conducted around April 2021 to an inference that Walker herself was not promoted to Deputy District Chief in February 2024 due to her engaging in protected activities is far too speculative. *Bass*, 746 F.3d at 841.

In sum, Walker has not produced sufficient evidence, individually or when viewed as a whole, from which a reasonable jury could infer causation for her retaliation claim. For these reasons, the Court grants the City summary judgment on Count III.

### III. Violation of Equal Protection Under Section 1983 (Count IV)

There is no *respondeat superior* liability under Section 1983. *Kinslow v. Pullara*, 538 F.3d 687, 692 (7th Cir. 2008). Consequently, government officials can only be held responsible under Section 1983 if they (1) were personally involved in the constitutional violation, and (2) had the necessary state of mind. *Bostic v. Murray*, 160 F.4th 831, 841 (7th Cir. 2025). And a municipality can only be liable under Section 1983 "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Spiegel v. McClintic*, 916 F.3d 611, 617 (7th Cir. 2019) (citing *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978)).

Defendants argue that Walker has failed to demonstrate either situation, and thus summary judgment is appropriate on Count IV. The Court agrees.

**a. The Individual Defendants**

To survive summary judgment on her individual-capacity claims under Section 1983, Walker must establish not only that Commissioner Nance-Holt and Deputy Commissioner Helmold were personally involved in the alleged discriminatory conduct, but also that they "acted with the necessary state of mind." *Bostic*, 160 F.4th at 841. In the equal protection context, this requires demonstrating that Commissioner Nance-Holt and Deputy Commissioner Helmold had "the specific intent to discriminate" because "the state of mind of purposeful discrimination is an element of the violation." *Id.* at 842 (citing *Locke v. Haessig*, 788 F.3d 662, 669 (7th Cir. 2015)).

Walker presents no evidence from which a reasonable jury could find any discriminatory intent by Commissioner Nance-Holt or Deputy Commissioner Helmold. Her evidence shows only, at best[12], that they were involved in the appointment process for Deputy District Chiefs, [54] ¶ 35, and that a promotion to Deputy District Chief is "By Order of" Deputy Commissioner Hemold and "Approved by" Commissioner Nance-Holt. *Id.* Mere involvement in the appointment process, however, would not allow a reasonable jury to infer that Commissioner Nance-Holt and Deputy Commissioner Helmold intended to discriminate against Walker based on her sex or race. Discriminatory intent instead requires showing that a defendant undertook "a course of action only because of, not merely in spite of, the action's adverse effects upon an identifiable group." *Locke*, 788 F.3d at 669. Walker's proffered evidence offers no such inference.

Accordingly, the Court grants Commissioner Nance-Holt and Deputy Commissioner Helmold summary judgment on Count IV.

**b. The City**

To survive summary judgment on a *Monell* claim, a plaintiff must show that her constitutional rights were violated by a municipal policy, which may take the form of (1) an express policy; (2) a widespread practice or custom; or (3) an action caused by a person with final policymaking authority. *First Midwest Bank Guardian of Est. of LaPorta v. City of Chicago*, 988 F.3d 978, 986 (7th Cir. 2021) (citing *Spiegel*, 916 F.3d

[12]Defendants dispute that Commissioner Nance-Holt and Deputy Commissioner Helmold are involved in the promotion process. But even if they were, the evidence does not show any intent to discriminate by them.

at 617). The plaintiff must also demonstrate "culpability, meaning that policymakers were deliberately indifferent to a known risk that the policy would lead to constitutional violations." *Hall v. City of Chicago*, 953 F.3d 945, 950 (7th Cir. 2020). Finally, the plaintiff must prove "causation, meaning the municipal action was the 'moving force' behind the constitutional injury." *Id.* (citation omitted).

As a threshold matter, Defendants point out that Walker's *Monell* claim against the City fails as she cannot establish that she suffered any constitutional violation. [55] at 14, 26; [58] at n.1; *see MBM Holdings LLC v. City of Glendale*, 843 F. App'x 5, 8 (7th Cir. 2021) ("The first step in a *Monell* claim is proving a constitutional violation."). The standards for proving discrimination under Title VII apply equally to Section 1983 equal protection claims. *Williams v. Seniff*, 342 F.3d 774, 788 n.13 (7th Cir.2003)[13]. Therefore, because a reasonable jury could not find that the City discriminated against Walker under Title VII, a reasonable jury likewise could not find that the City violated Walker's right to equal protection.

But even if a constitutional violation were established, Defendants argue that Walker presents no evidence that a City policy caused the constitutional violation. [46] at 23–25. Walker disagrees, maintaining that a widespread practice or custom of the City as well as a final policymaker's decision caused her constitutional violation. [55] at 13–14. Neither theory, however, carries the day.

As to a widespread custom and practice, Walker maintains that CFD had a "systemic, unwritten, and discretionary promotion process" that "boiled down to

---

[13]The standard also applies to discrimination claims under Section 1981. *Liu v. Cook Cnty.*, 817 F.3d 307, 315 (7th Cir. 2016).

subjective decisions based on a determination of who Ferman worked with and liked." *Id.* at 9, 13. She contends this promotion process "lack[ed] safeguards against discrimination" and resulted in the "uniform exclusion of women." *Id.* at 13. Defendants dispute this characterization and that the promotion process amounted to a "custom or practice." [58] at 13. But even if it were, Walker presents no evidence that City policymakers were deliberately indifferent to a known or obvious risk that the promotion process[14] would likely lead to constitutional violations. *Hall*, 953 F.3d at 950. Walker identifies no City policymaker who was even aware of CFD's promotion process. Nor does she present evidence from which a reasonable jury could infer that City policymakers were deliberately indifferent to risks in the process. *Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2010) (policymakers "must have been aware of the risk created by the custom or practice and must have failed to take appropriate steps to protect the plaintiff"). She provides only one example, herself, of an alleged constitutional injury resulting from CFD's promotion process. A single instance of unconstitutional conduct, however, is not enough. *Palmer v. Marion County*, 327 F.3d 588, 596 (7th Cir.2003). And no reasonable jury could find—nor does Walker argue—that the risk of unconstitutional consequences from CFD's promotion process were so patently obvious that the City could be liable without evidence of a pattern of violations. *Dean*, 18 F.4th at 236–37 (7th Cir. 2021) (noting such instances are "rare").

---

[14]Another way of showing deliberate indifference is by showing the policy at issue is facially unconstitutional. *Dean v. Wexford Health Sources, Inc.*, 18 F.4th 214, 235 (7th Cir. 2021). Walker, however, makes no such argument here.

Walker also fails to demonstrate "moving force" causation. This "rigorous causation standard" requires Walker to "show a direct causal link between the challenged municipal action and the violation of [her] constitutional rights." *LaPorta*, 988 F.3d at 987 (cleaned up). Walker, however, fails to show that it was the CFD promotion process for Deputy District Chiefs itself—rather than the interview panel's exercise of discretion within the promotion process—that caused her alleged constitutional injury. *See Dean*, 18 F.4th at 239 (a plaintiff must show that the policy itself, "not simply the actions of the employees administering it," directly caused the constitutional injury).

Walker fares no better on her final policymaking authority theory, in which she claims that Commissioner Nance-Holt retained "final approval authority" over Deputy District Chief promotions.[15] [55] at 13. For Commissioner Nance-Holt to have final policymaking authority, she "must be responsible for establishing final government policy on a particular issue." *Valentino v. Vill. of S. Chi. Heights*, 575 F. 3d 664, 676 (7th Cir. 2009). "State or local law determines whether a person has policymaking authority for purposes of § 1983." *Waters v. City of Chicago*, 580 F.3d 575, 581 (7th Cir. 2009). Even if Commissioner Nance-Holt was involved in decisions relating to Deputy District Chief promotions, Walker provides no evidence that Commissioner Nance-Holt was given authority by state or local law to set policy over those decisions. *See Valentino*, 575 F.3d at 675 ("just because Owen is the

---

[15] While Walker contends that Commissioner Nance-Holt testified that she had "final authority," [54] ¶ 35, the cited portion of Commissioner Nance-Holt's deposition does not support this assertion. [45-17] at 43:15–44:10.

*decisionmaker* on hiring/firing decisions for the Village government does not necessarily make him the *policymaker* on those issues.") (emphasis in the original). Instead, the Seventh Circuit has recognized that the City's Council and the City's Commissioner of Human Resources are the final policymakers in the area of employment. *Waters,* 580 F.3d at 581. Walker provides no evidence that Commissioner Nance-Holt held either of those roles or was delegated policymaking authority by the City's Council or the Commissioner of Human Resources.

For these reasons, the Court grants the City summary judgment on Count IV.

**IV. Violation of Section 1981 (Count V)**

"A claim of employment discrimination, such as a failure to promote, is actionable under § 1981." *Smith v. Allstate Ins. Corp.*, No. 00 C 7822, 2001 WL 1000736, at *9 (N.D. Ill. Aug. 29, 2001) (citing *Vakharia v. Swedish Covenant Hospital*, 190 F.3d 799, 806 (7th Cir.1999)). But Section 1981 "does not create a private right of action against state actors." *Campbell v. Forest Pres. Dist. of Cook Cty*, 752 F.3d 665, 671 (7th Cir. 2014). Rather, Section 1983 is "the exclusive remedy for violations of § 1981 committed by state actors." *Id.* As Defendants are state actors, they are entitled to summary judgment on Count V based on *Campbell* alone.

Resisting this outcome, Walker asserts that—despite her labelling—her Section 1981 claim in Count V should be construed as arising under Section 1983 and thus *Campbell* does not apply. [55] at 7. Courts in this district have allowed such a maneuver. *See e.g., Edmond v. City of Chicago*, No. 17-CV-04858, 2018 WL 5994929, at *6 (N.D. Ill. Nov. 15, 2018). However, even if so construed, summary judgment is

still appropriate because, as with other Section 1983 claims, recovery under a Section 1981 theory cannot be based on *respondeat superior*. *Smith v. Chicago Sch. Reform Bd. of Trs.*, 165 F.3d 1142, 1148 (7th Cir.1999). Thus, Walker must demonstrate that Commissioner Nance-Holt and Deputy Commissioner Helmold intended to discriminate, or, in the case of the City, that the discrimination was part of a widespread policy or practice or caused by a person with final policymaking authority. *Sommerfield v. City of Chicago,* No. 08 C 3025, 2011 WL 4553021, at *2 (N.D. Ill. Sept. 29, 2011)*; Myers v. Joliet Twp. High Sch. Dist. No. 204*, No. 12 C 1866, 2013 WL 3874057, at *4 (N.D. Ill. July 26, 2013). As explained, Walker has established neither.

For these reasons, summary judgment is granted as to Count V.

## CONCLUSION

For the stated reasons[16], Defendants' motion for summary judgment [44] is granted. The Clerk is directed enter judgment in Defendants' favor and against Walker. Civil case terminated.

E N T E R:

Dated: August 18, 2026

MARY M. ROWLAND
United States District Judge

[16]Because the Court grants Commissioner Nance-Holt and Deputy Commissioner Helmold summary judgment for other reasons, it declines to address the qualified immunity arguments.